Pitkin *v.* The Long Island Rail-Road Company.

---

PITKIN *vs.* THE LONG ISLAND RAIL-ROAD COMPANY.

An agreement made by a rail-road company, with a person owning land adjacent to the rail-road, to establish and maintain a permanent turnout track, and stopping place, at a particular point, in the neighborhood of his property, and to stop there with the freight trains and passenger cars of the company, is, in substance, the grant of an easement, or servitude, which is to be binding upon the property of the rail-road company, as the servient tenement, for the benefit of the owner of such adjacent property, and of all those who shall succeed him, in his estate, as owners thereof. And such an agreement, to be valid, must be in writing.

The negative easement, which the owner of the dominant tenement is to acquire by

such an agreement, is an incorporeal hereditament; the right or title to which can only pass by grant, or deed under seal, or be acquired by prescription.

The provision of the revised statutes, declaring that no estate or interest in lands, or any trust or power over them, shall be created or granted, except by operation of law, or by a deed or conveyance in writing, &c. is sufficiently broad to prevent the acquiring of an easement in land by a verbal agreement merely.

A parol executory agreement, between an individual and a rail-road company, that the latter shall continue to stop with their cars at a particular place, adjacent to his property, as a permanent arrangement, is void by the statute of frauds; because from the nature and terms of the agreement it is not to be performed within one year from the making thereof.

THIS was an appeal from a decree of the assistant vice chancellor of the first circuit, dismissing the complainant's bill with costs. The object of the bill was to compel the Long Island Rail-Road Company to keep up and maintain a turnout track, and permanent stopping place for its freight trains and its passenger cars, on the line of its rail-road, at a place called the trotting course lane; for the benefit of the complainant as the owner of real estate adjacent to that place.

*J. H. Raymond,* for appellant. The evidence in this cause clearly establishes the contract, set forth in the complainant's bill, and a full and perfect performance of it on the part of the complainant. There is no uncertainty about the terms of the contract. They are explicitly stated in the bill, and fully made out by the evidence. Assuming that the terms of the contract as to the time and manner of performing it, and the portion of the labor and expense to be borne by the parties respectively, are made out with sufficient certainty, the next question that arises is as to the length of time during which this improvement was to continue. It is contended by the complainant that it was to be permanent, unless both parties should agree to discontinue it. The defendants secured to themselves the benefit of the drawback, or return of duties upon the iron laid on this turnout, as authorized by the act of congress, passed July 14, 1832. And to do this, they must have proved to the secretary of the treasury, by the oaths of their officers, that the rails were actually and permanently laid upon the turnout. For

this proof is required to be made, by the 1st section of the act of congress, as a condition of such return of duties. The defendants are therefore estopped, by their own acts, from insisting that it was not the understanding that the arrangement was to be permanent. The complainant incurred a large amount of expense, and performed a large amount of labor, in fulfilling his part of the agreement. From the nature of the transaction it must be presumed that the complainant expected a permanent benefit from his expenditure of time and money.

There was a sufficient consideration for the obligation on the part of the defendants to keep this up as a permanent depot and stopping place. It is enough that the parties entered into the arrangement, and that the complainant has by the procurement of the defendants, incurred the expense and performed the labor necessary for grading the track for this turnout and stopping place. The complainant did not guaranty any particular advantage or profit to the defendants under this agreement. Of the sufficiency of the inducement for entering into the arrangement each party must determine; and having entered into the agreement, each party is concluded. Any act of the plaintiff from which the defendant derives a benefit or advantage, or any labor, detriment or inconvenience sustained by the plaintiff, however small the benefit or inconvenience may be, is a sufficient consideration, if such act is performed or such inconvenience suffered by the plaintiff with the consent, either express or implied, of the defendant. (*Sel. Nisi Prius*, 36. *Miller* v. *Drake*, 1 *Caines' Rep.* 45. *Powel* v. *Brown*, 3 *John. Rep.* 100. *Williamson* v. *Clements*, 1 *Taunt.* 523. *Religious Society in Whitestown* v. *Stone*, 7 *John. Rep.* 112.)

It was not essential to the validity of this agreement that it should have been authenticated by the corporate seal of the defendants, or confirmed by a formal resolution of the board of directors. It is enough that the agents and officers acted within the scope of their general power. A corporation, as well as an individual, may be bound by parol and implied contracts. An agreement made by the agents of a corporation exercising a general discretion and authority within the range of express

or implied powers, is binding upon the company. More especially will it be valid if made and carried into execution under the eye and with the full knowledge of the officers and directors of the corporation, and when transactions material to the execution of the agreement, and connected with the execution of it, are acted upon and sanctioned as corporate acts. (*Mott* v. *Hicks*, 1 *Cowen*, 513. *Bank of Columbus* v. *Paterson*, 7 *Cranch*, 299. *Fleckner* v. *The United States Bank*, 8 *Wheat.* 338. 2 *Kent's Com.* 288.) It is in proof that the directors and vice president of the company were cognizant of the fact that the excavation of the turnout and side track was going on, pursuant to an arrangement between the complainant and the defendants. The defendants' engineer, and his assistants, superintended the grading of the track, and took the levels and overlooked the laying of the rails. All the orders respecting this work, emanated in the usual way from the defendants; and the engineer, &c. were paid by them for their service. Every thing in fact material to establish this, as the rightful and authorized act of the defendants, is admitted in the answer. The fact also that the defendants made the necessary proof to the secretary of the treasury, that the rails on the track had been permanently laid, furnishes the most ample evidence, not only that this whole transaction was originally sanctioned by the defendants, but that they have affirmed and sanctioned it by their corporate and official acts.

·This is not such a contract as comes within the statute of frauds. No interest in lands was created, granted or affected by it. Nor was any trust or power over or concerning lands, or relating thereto, created or affected by this agreement. Nor does any such object appear to have been contemplated by either of the parties to it. The defendants themselves have only a qualified interest in the land over which the road extends. They take it as a body corporate, in a limited capacity, and for a specific purpose. And when the object for which they have acquired it ceases, it will by operation of law revert to the original proprietors. (*Peck* v. *Smith*, 1 *Conn. Rep.* 103. *Hart* v. *Chalker*, 5 *Id.* 311. *Hooker* v. *Utica Turnp. Co.*, 12 *Wend.*

371. 2 *John. Dig. tit. Highways.*) The defendants cannot exercise powers, or acquire rights, for purposes foreign to their corporate existence. They cannot purchase or convey real estate in general terms or for general purposes. They may acquire certain rights in real estate, as connected with and incidental to the purposes of their incorporation; but these rights they are incompetent to sell, transfer or traffic in general terms. They are not the subject of the class of contracts contemplated by the statute of frauds. The business of the defendants has no relation to lands, in a legal or primary sense. They have a right, it is true, to use in a certain way, and upon certain terms and conditions, so much land as is necessary to construct their road and its appendages. And here their power over land, and their capacity to use or affect land, ceases. There is no right or title, then, in the defendants in relation to which the agreement in controversy could legitimately become a subject that would be affected by the statute of frauds. The contract in this case is simply one that relates to the construction of a part of the defendants' road, or an appendage to it; and regulates to a certain extent the manner of using it. It is no more a contract affecting lands, in the view of the statute of frauds, than the ordinary agreements with contractors or workmen to furnish or perform work in the construction of the road, or the ordinary agreements for the transportation of goods in a specified manner and for a given period of time. As to so much of the agreement as relates to the grading of the turnout by the complainant, and the laying down the rails by the defendants, it has reference merely to the construction of this portion of the defendants' road. And as to the stoppage of the cars, and other matters mentioned in said agreement, it merely has reference to the mode in which the defendants will carry on a certain portion of their business intended to be incidentally beneficial to the complainant when carried on in that manner. There is no imaginable right or privilege appertaining to the soil, or partaking of the nature of real estate, that the contract in question could secure to the complainant, were it enforced to its fullest extent. In the case of *Mumford* v. *Whitney*, (15 *Wend.* 380,)

the court say that a license to enter upon lands is valid, though not in writing. This contract does not affect land so far as to give a license to enter upon it. It is a mere personal contract, whereby the defendants have bound themselves to do certain acts in relation to the business for which they were incorporated ; upon an adequate consideration which they have received from the complainant. From such a contract the statute of frauds will not release them. (3 *John.* 216. 5 *Id.* 272. 11 *Id.* 145. 10 *Id.* 109. *Noyes* v. *Chapin,* 6 *Wend.* 461.)

But if upon general principles this were such a contract as might be affected by the statute of frauds, the fulfilment of it on the part of the complainant, and the laying down the track, and the establishment of the turnout by the defendants, are so far a part performance as to take it out of the operation of the statute. A part performance of an agreement, that might otherwise be void, will in equity prevent the statute from operating, when there would be injustice in allowing a party to refuse to comply with an agreement which had been performed in part, or in the whole, on the other side, or when it would be a fraud upon the other party were performance refused. The statute has in terms exempted this class of cases from its operation. (2 *R. S.* 135, § 10.)

This is a proper case for the court to decree a compensation in damages, if it should be thought more conducive to justice and equity to give relief in this form. The court has jurisdiction to grant equitable relief. The case falls within that class of cases cognizable in courts of equity. It may decree a specific porformance ; and is bound to give relief in some form. Having jurisdiction, and the case being one suitable for equitable relief, the court may, instead of a decree for specific performance, decree a compensation in damages. The cases in which specific performance may be decreed are proper cases for a decree of compensation in damages, if in the judgment of the court justice would be better promoted by affording relief in that form. (*Denton* v. *Stuart,* 1 *Cox's Cas.* 288. *Phelps* v. *Thompson,* 1 *John. Ch. Rep.* 150. *Story's Eq.* 107, 8.)

*W. C. Noyes*, for respondents.   The complainant has failed
to prove the contract alleged in his bill.   The burthen of proof
lies on him; and having attempted to show that the contract
was made with Blydenburgh, he should have shown clearly
that Blydenburgh possessed the power to make such a contract.
This he has not done.   There is no proof in the case, to show
what were the powers of Blydenburgh as vice president, either
general or special, which would warrant him in making such a
contract.   A contract like the one set out in the bill would not
be within the usual scope of the powers or authority of any of
the officers of the company.   The power to make such a con-
tract could only exist in the board of directors, or emanate
thence by express delegation to some officer of the company.
The general authority of the officers must have been confined
to two particulars : the construction of the road, and the ope-
rating it when constructed.   The utmost extent to which any
officer could take an implied authority, for either of the above
purposes, would be to procure labor in the construction of the
rail-road, or in operating it, and to pay for, or pledge the credit
of the company for its payment, in money.   (*Angell & Ames
on Corp.* 239, *ed. of* 1843.   *National Bank* v. *Norton* 1 *Hill's
Rep.* 572.)   No vote, resolution, or proceeding of the directors,
authorized the contract.   No general by-law or regulation of
the company is stated or set forth as sanctioning it.   No proof
shows how the company came to have a vice president, nor
what were his powers and duties.   And as a vice president is
not spoken of in the charter, and the only power to appoint one
comes from the revised statutes respecting corporations, he must
clearly be one of those subordinate officers or agents which
every corporation has the right to appoint, and the scope of his
authority must necessarily be confined to subordinate matters,
and not as extensive as that of the principal officers of the com-
pany.   But even if Blydenburgh had the power to contract, it
is manifest that he did not contract in such a manner as to bind
the company.   It cannot be successfully contended that the
contract in question could subsist in parol.   For it would be a
contract creating an estate or interest in, or a trust or power

over, or concerning lands, or in some measure relating thereto. (2 *R. S.* 69, § 6.)   By the alleged contract, the company were bound to construct a rail-road, or side track, on their lands, adjacent to complainant's lands; to continue it there; to keep it in repair; and to use it in a particular manner.   And the complainant had a power to insist on all these things being done. It would in fact amount to a right in the complainant to have a road or passage over lands of the defendants, of a peculiar construction, and to have it kept open and in repair, by them, during the continuance of defendants' charter.   (*Cook* v. *Stearns,* 11 *Mass. Rep.* 533.   *Jackson* v. *Buel,* 9 *John.* 298.   2 *Black Com.* 20, 35.   *Mumford* v. *Whitney,* 15 *Wend.* 381.)   The authorities above cited show that such a right would be an incorporeal hereditament; and could only be created by grant. The alleged contract, by its terms, was not to be, and could not be, performed within a year.   (*McLees* v. *Hall,* 10 *Wend.* 438.   1 *Barn. & Ald.* 722.   *Hinckley* v. *Southgate,* 11 *Verm. Rep.* 340.)   Again; such a contract as the one set up in the bill could only be made under the seal of the company,   And in that case alone would it be binding on the corporation. (*Arnold* v. *Mayor, &c. of Poole,* 7 *Lond. Jurist,* 653.)

But if it be conceded that there was some kind of a contract, it is plain that according to the rules of equity, it ought to be positive and clear in its terms, in order to justify a decree for a specific performance.   The terms in which the statement of the contract is made, in the bill, are loose and indefinite.   No time is mentioned during which it was to continue; nor does it appear, with clearness, what the defendants were bound to do. (See *Kendall* v. *Alair,* 2 *Sumner's Rep.* 278; *Thomson* v. *Scott,* 1 *McCord's Ch. Rep.* 32; *Parkhurst* v. *Van Cortlandt,* 1 *John. Ch. Rep.* 283; *Phillips* v. *Thompson, Id.* 131; 1 *Sugden on Vend.* 120 to 132.)

The contract, if made, was not made upon adequate consideration.   All that the complainant did, was to perform the excavation and grading; amounting to about 3000 cubic yards of excavation.   This, at 14 cents per yard, would come to $420; but in making this excavation, he was aided by the

labor of a man and a horse, and the use of the cars of the com pany, with other privileges.  For this he would claim that the defendants should place there their timbers and iron rails, worth from $7000 to $10,000 per mile, or, for the 1700 feet which this turnout extended to, at least $3000 ; and supply the materials when decayed, and incur the whole expense of repairs and superintendence.  The contract would be so strikingly inequitable as to come within that class of cases where a specific performance has been refused upon that ground.  Besides ; it may well be that the complainant, from the time that the track continued, that is, from 1837 to 1841, derived sufficient benefit to compensate him for his expenditures.  The contract, if made, was therefore voluntary, or nearly so.  (*Black* v. *Card*, 2 *Harris & Gill*, 100.   *Graves* v. *Graves*, 3 *Young & Jervis*, 163.)  The cases cited on the other side are all cases at law ; and are not authorities to determine in what cases courts of equity will decree specific performance.

The contract calls for continued acts to be done by defendants from the time it was made, during the continuance of defendants' charter.  It is not practicable for a court of chancery to execute such a contract ; because it has no means to compel such execution.  The court would have to appoint a special master in chancery, or other officer, to see that the side track was kept in repair and properly attended, and that every passenger train stopped to take in and unload passengers, and that every thing continued to be done for the performance of the contract.  (*Capes* v. *Hutton*, 2 *Russ.* 357.   *Rivafinoli* v. *Corsetti*, 4 *Paige*, 264.   *Clark* v. *Price*, 2 *Wils. Ch. Rep.* 157.   *Agar* v. *McLew*, 2 *Sim. & Stew.* 418.)  The general principle of these cases is, that the court will not direct a performance, unless it has the power to direct and superintend all the acts necessary for a performance.

The case shows that no contract was in the contemplation of either party, looking further than to effect the temporary object, then in view, to lay down the iron rails at the place in question.  And if a change of circumstances has rendered it inexpedient for the company to continue the turnout, they

Pitkin *v.* The Long Island Rail-Road Company.

ought to be allowed to discontinue it ; especially as its continuance would not benefit the complainant.

The complainant is not entitled to a compensation in damages, at least not in this court, because there was no contract with him ; and if no contract, then no damages. Besides ; we derived no benefit from any of his acts. The road bed was already graded on the north side, where all our other side tracks were laid, so as to form parts of a second track; and without incurring a dollar of expense for excavation, we could have laid our rails there. Our laying them on the other side, to accommodate the complainant, cannot afford a foundation for any claim to damages. It does not appear that the complainant has sustained any damage by our moving the rails. They had lain there five years, and during the last two at least, had been wholly useless ; and the presumption is that they would have continued so.

THE CHANCELLOR. The complainant claims the relief asked for in his bill, under an alleged agreement, by parol, made with him by one of the officers of the rail-road company, to establish and maintain a permanent turnout track and stopping place in the neighborhood of his property ; and to stop there with the freight trains and passenger cars of the company. And the consideration for the alleged contract, was the labor which he was to perform in excavating and grading the land at that point upon the rail-road. I think, with the vice chancellor, that the complainant failed to establish an agreement which was binding upon the company, even if it was competent for him to establish an agreement of this kind by parol. There is no sufficient evidence of the authority of Blydenburgh to make such an agreement for the company. Neither does his testimony show that the stopping place was to be continued there during the existence of the charter of the company, or for any definite time ; though Blydenburgh and the complainant undoubtedly supposed it would be continued there, unless the interest of the company and the convenience of the public should require its removal to some other place.

Pitkin *v.* The Long Island Rail-Road Company.

Again; I think the agreement, which the complainant claims to have been made, could not be made by parol, under the provisions of the common law and of the statute of frauds. It was, in substance, the grant of an easement or servitude, which was to be binding upon the property of the rail-road company, as the servient tenement, for the benefit of the complainant, and those who should succeed him in his estate, as the owner of the adjacent property. (1 *Pardessus Traite des Servitudes, ch.* 1.) For the complainant has no legal interest in having a turnout track and stopping place permanently established there, except as it may benefit him as such owner. The right claimed by him therefore, under the parol agreement with Blydenburgh, is a negative easement in the property of the rail-road company. That is; the power to restrict the company, as the owners of the servient tenement, in the exercise of general and natural rights of property; and to compel them to use it in a particular way, by keeping certain erections thereon and stopping with their trains at a particular place, for his use and benefit as the owner of the adjacent land, as the dominant tenement. It is therefore an incorporeal hereditament; the right or title to which can only pass by grant, or deed under seal, or be acquired by prescription. In the case of *Fentiman* v. *Smith*, (4 *East's Rep.* 107,) Lord Ellenborough states the principle, distinctly, that the right to have water pass over the lands of another, by a tunnel, could not be acquired by a parol license, without deed. In the case of *Hewlins* v *Shippam*, (7 *Dow. & Ryl.* 783 ; 5 *Barn. & Cress.* 221, *S. C.*) the defendant, for a valuable consideration, had assented to the making of a drain, in his lands, by the defendant, and the latter had made it at considerable expense. The defendant was sued for stopping up the drain. And the court, upon a full examination of all the cases, decided that an easement in the land of another was an uncertain interest in land, within the statute of frauds, and could not be acquired by a parol agreement.

The provision of the revised statutes on this subject is, that no estate or *interest* in lands, or any trust or power over or concerning lands, or in any manner relating thereto, shall be cre-

ated, granted, assigned, surrendered, or declared, unless by act or operation of law, or by a deed or conveyance, &c. (2 *R. S.* 135, § 6.) And it is sufficiently broad to exclude the idea of acquiring an easement in land by a verbal agreement merely.

And as a mere executory agreement between the complainant and the company, that the latter should continue to stop with their cars at that place, as a permanent arrangement, the agreement made by Blydenburgh for the company was void; because, from the nature and terms of the agreement it was not to be performed by the company within one year from the making thereof. (*See* 2 *R. S.* 135, § 2, *sub.* 1.)

The complainant, therefore, was not entitled to the relief prayed for in his bill, nor to any other relief, upon the pleadings and proofs in this case. His bill was properly dismissed; and the decree appealed from must be affirmed with costs.