1833.<br>Le Roy<br>v.<br>Platt.

---

## Le Roy *vs.* Platt and others.

Where there is a mistake in a deed to a trustee, who afterwards conveys the premises to the cestui que trust without any new consideration, the latter is not entitled to defend himself as a bona fide purchaser without notice of the mistake.

By the grant of a mill, or the grant of land with the mill thereon, the waters, flood gates, &c. which are necessary for the use of the mill, pass as incident to the principal subjects of the grant.

Where lands belonging to the owner of a mill are overflowed by the water of the mill pond, a conveyance of the mill with the waters and water courses, &c. gives a right to the grantee to continue to overflow lands of the grantor which are not conveyed, to the same extent that they were overflowed by the waters of the mill pond at the time of the conveyance.

If a defendant puts in his answer and goes to hearing, without objecting to the jurisdiction of the court on the ground that the complainant has a perfect remedy at law, it is too late to make that objection at the hearing.

THE bill in this cause was filed to restrain the defendants from prosecuting a suit at law in the supreme court. The complainant was the owner of mills at the village of Le Roy; and, as the defendants alleged, he had without authority overflowed their lands by the waters of his mill pond. In August, 1801, the complainant and three other persons were the owners of a large tract of land, usually denominated the triangular tract. On the 4th of August, 1801, the proprietors of the triangle entered into a contract with R. M. Stoddard and D. Saltonstall to sell to them lot No. 3, in section No. 1, of township No. 1 in that tract; which lot contained

January 28.

about 500 acres of land, and included the mill seat and the other premises in controversy in this cause. By this contract, Stoddard and Saltonstall agreed to erect a grist mill and a saw mill on the premises within two years, and were to pay to the proprietors of the triangle $2500, in four annual instalments, with interest. And upon the payment of such purchase money, and the performance of the other conditions of the contract on the part of the purchasers, the proprietors were to execute to them a conveyance in fee. In April, 1802, E. Platt, the ancestor of the defendants, entered into a contract with Saltonstall to purchase his right to the undivided half of a ten acre mill lot mentioned in the contract of August, 1801. And Platt covenanted to perform the agreement made by Saltonstall jointly with Stoddard, as to the erection of the grist mill, and the keeping in repair the saw mill which had then been erected upon the mill lot. A division was subsequently made of the other lands, in lot No. 3, except the ten acre mill lot. And E. Platt afterwards purchased of Saltonstall his right to certain other lands held under the contract with the proprietors of the triangle; which purchase included the lands now alleged to be overflowed by the complainant's dam. Soon after E. Platt's contract for the purchase of half of the mill lot, he and Stoddard erected a grist mill thereon, in addition to the saw mill which had been previously built; and E. Platt continued in the possession and occupation of the mills until his death, in 1811. By his will, he authorized L. Ward, junior, his executor, to sell his real estate, for cash or on credit. In pursuance of such authority, the executor, in April, 1814, contracted to sell to G. Newell the interest of E. Platt in the undivided half of the ten acre mill lot, and the mills, mill seat, ways, waters, and water courses, with the privileges and appurtenances, for the price or consideration of $3000. And Newell was authorized to apply any part of the purchase money in paying what was due to the proprietors of the triangle on account of any of the lands belonging to the heirs and devisees of E. Platt. In January, 1818, Newell obtained a conveyance from the proprietors of the triangle for the undivided half of the ten acre mill lot, and also for that part of the other lands which had been

set off to Saltonstall in the division between him and Stoddard. That conveyance included the lands now in controversy, or alleged to be overflowed ; which E. Platt in his lifetime had purchased from Saltonstall. On the 23d of February, 1818, Newell conveyed the last mentioned land to Ward, the executor, with covenants of warranty. And Ward afterwards divided the same among the heirs and devisees of E. Platt. Lots No. 1 and 2, of that division, fell to the share of Ira Platt, who afterwards died without issue leaving the defendants, except the defendant Margaret Platt his mother, his heirs at law.

In January, 1818, Webb and Dummer recovered a judgment in the supreme court against Newell, which was docketed the 20th of the same month ; upon which judgment an execution was issued to the sheriff of Genesee. Under this execution, the undivided half part of the mill lot, with the mills thereon, were sold and conveyed by the sheriff to the proprietors of the triangle, in September, 1819. In a subsequent partition between those proprietors this undivided half of the mills and mill lot was assigned to the complainant ; and he afterwards acquired the title to the other half, under Stoddard's heirs. It was alleged, in the bill, that in the conveyance from Newell to Ward of the lands adjoining the mill lot, and which were overflowed by the complainant's dam through inadvertence or accident, a mistake had occurred in not inserting an exception or reservation of the mills, mill seat, ways, waters and water courses, in conformity with the provisions of the agreement of April, 1814. This allegation was denied by the defendants, upon their information and belief only. Much testimony was taken in the cause ; but it was principally in reference to the relative height of the several dams which had been built in 1801, 1815 and 1824, and as to the quantity of land overflowed by means of such dams respectively. The cause was heard on pleadings and proofs.

*H. J. Redfield,* for the complainant, cited 1 *Mad. Ch.* 24, 47 *to* 84 ; *Rob. on Frauds,* 82 ; *Joynes* v. *Statham,* 3 *Atk. Rep.* 387 ; *Ex parte Mills,* 2 *Ves. jun.* 299 ; *Gillespie* v. *Moon,* 2 *John. Ch. Rep.* 596 ; *Kidney* v. *Coussmaker,* 1 *Ves. jun.* 445 ;

*Higinbotham* v. *Burnett,* 5 *John. Ch. Rep.* 187 ; *De Riemer* v. *De Cantillon,* 4 *Id.* 85 ; 1 *Shep. Touch.* 89 ; *Jackson* v. *Dunsbagh,* 1 *John. Cas.* 91 ; *Stow* v. *Tifft,* 15 *John. Rep.* 463 ; *Phœnix Ins. Co.* v. *Gurnee,* 1 *Paige's Rep.* 278 ; *Jackson* v. *Wilkinson,* 17 *John. Rep.* 146 ; *Jackson* v. *Defendorf,* 1 *Caines' R.* 493 ; *Mann and Toles* v. *Pearson,* 2 *John. Rep.* 37 ; 3 *Dane's Abr. ch.* 76, *art.* 8, *sec.* 12 ; 4 *Id. ch.* 114, *art.* 29, *sec.* 2 ; *Leonard* v. *White,* 7 *Mass. Rep.* 6 ; 1 *Jac. Law Dic.* 119, *tit. Appurtenances ; Howton* v. *Frearson,* 8 *T. R.* 50 ; *Rob. on Frauds,* 153 ; *Rosevelt* v. *Fulton,* 2 *Cowen's R.* 129 ; *Dale* v. *Rosevelt,* 5 *John. Ch. Rep.* 174 ; *Higinbotham* v. *Burnett,* 5 *Id.* 184 ; 3 *Kent's Com.* 355 ; *Sweet* v. *Green,* 1 *Paige,* 473.

*W. Kent,* contra, cited *Hart* v. *Ten Eyck,* 2 *John. Ch. Rep.* 63 ; *Executors of Getman* v. *Beardsley,* 2 *Id.* 274 ; *Nicoll* v. *Trustees of Huntington,* 1 *Id.* 183 ; *Att'y Gen. to the Prince of Wales* v. *St. Auban and others,* 1 *Wightwick's Excheq. Rep.* 185 *to* 187, 196 *to* 198, 214 *to* 216, 220 *to* 238 ; 1 *Mad. Ch.* 25, 26, 135 ; *Speer* v. *Crawter,* 2 *Merivale,* 410 ; *Eden on Inj.* 31, 37 ; *Robinson* v. *Lord Byron,* 1 *Brown's Chan. Cas.* 588 ; 2 *Cox's Ch. Cas.* 4, *S. C. ; Crowden* v. *Tinckler,* 19 *Ves. R.* 625.

THE CHANCELLOR. Margaret Platt, the mother of I. Platt, deceased, joined in the suit at law as one of the plaintiffs. Although she could not be the heir to her son, as the law then stood, yet the complainant was justified in making her a party in this suit, as she might have acquired an interest in the premises in question in some other way. She alleges in her answer that she had no interest or claim in this controversy, and that her name was used as a plaintiff in the suit at law by mistake. As there is an improper joinder of plaintiffs, it is a matter of course that the suit at law must be discontinued, and the complainant will recover his costs of the defence by the judgment of the court in which the suit is pending. There can therefore be no necessity for a decree against Mrs. Platt, whatever may be the result of this suit as to the other defendants. The bill as against her must therefore be dismissed, but without costs.

One objection made upon the argument, on the part of the defendants, was, that even if the allegations in the bill

were true, the complainant had a perfect defence at law; and, therefore, that this court could not take jurisdiction of the case. The short answer to this objection is that the defendants have not raised any such objection by their answer, and they are too late in making it for the first time at the hearing. (*Grandin* v. *Le Roy*, 2 *Paige's Rep.* 509.)

From the pleadings and proofs in this cause, it is very evident that the conveyance from the proprietors of the triangular tract to Newell in January, 1818, and the subsequent conveyance from him to Ward the executor in February thereafter, were merely the means adopted by Newell and Ward for carrying into effect the contract of April, 1814, for the sale of the undivided half of the mill lot to Newell. E. Platt in his lifetime or his executor afterwards, and it does not distinctly appear which, had become entitled to Saltonstall's interest in the whole premises set off to him in the partition or division between him and Stoddard in 1807. But the legal title to the whole was still in the proprietors of the triangle, to whom Newell was authorized to pay the balance of the purchase money then due to them from the estate of E. Platt. Newell, therefore, being entitled to a conveyance for the half of the mill lot, and the mills, mill seat, ways, water and water courses, with the privileges and appurtenances, under the contract of 1814, and the executor, as trustee for the heirs, being entitled to the residue of the property, Newell undoubtedly took the conveyance for the whole with the intention of afterwards conveying to the executor only that portion of the premises which he was not authorized to retain under his contract. In equity, therefore, he was entitled to the same rights as if the conveyance of the whole premises had been given by the proprietors directly to Ward and the latter had conveyed to Newell the undivided half of the mill lot, mills, &c. according to the terms of the contract of April, 1814. The covenant of warranty from Newell is easily accounted for; as it appears he had given back to the proprietors a mortgage upon the whole premises to secure a portion of the purchase money, and there was also an outstanding judgment against him which was a lien upon the legal in-

1833.

Le Roy
v.
Platt.

terest in the whole premises conveyed to him by the pro-prietors. Ward, the trustee, has no distinct recollection of the manner in which the parties intended to carry into effect the contract of 1814. He therefore leaves us, by his deposition, to draw such inference as may be properly drawn from the whole transaction. That inference is, that if a different interest was left in Newell, by his deed to Ward, from what it was intended he should have under the contract of April, 1814, there was a mistake in the deed, and it must be corrected so as to carry into effect the intention of the parties thereto. As the conveyances from Ward to the heirs were not founded on any new consideration, being merely transfers of the legal estate from a trustee to his cestui que trusts, the heirs are not entitled to protection as bona fide purchasers. And they must take the legal title subject to the correction of the mistake which has been made in the conveyance to Ward. Considering Newell as the owner of the mills and mill lot, and also as the owner of the servient tenement which was overflowed for the use of the mills, a sale and conveyance of the servient tenement to a third person without reserving the servitude, or the right of continuing to overflow the land for the necessary purposes of the mills, would probably extinguish that right. But if Ward is to be considered as owning the whole, and as selling the mill lot with the mills thereon, and the water and water courses, &c. then a conveyance from him to Newell in conformity to the contract of April, 1814, would have given the latter a perfect right to overflow the land to the same extent that it was overflowed, for the purposes of the mills, at the time of that conveyance. By the grant of a mill, or the grant of land with the mill thereon, the waters, flood-gates and the like, which are of necessary use to the mill, pass as incident to the principal subjects of the grant. (*Touchstone*, 89. 4 *Kent's Com. 2d ed.* 467.)

I apprehend, however, that the rights of the parties in this case do not depend upon the mere equitable claim to correct the mistake in the deed from Newell to Ward. But that the complainant has a legal right, under the sheriff's deed, which is paramount to the conveyance of the 23d of February, 1818. The judgment under which the land was sold by the sheriff

1833.

Le Roy
v.
Platt.

was docketed in January, 1818; and Newell was at that time the owner of the legal estate, both in the mill lot and in the land overflowed by the waters of the dam. The sheriff's deed relates back to the docketing of the judgment, so as to pass the same title to the purchaser as if the sale had taken place at that time, or at any time afterwards, before the conveyance to Ward. Although the lands conveyed to Ward were not sold under that judgment, and no interest therein was in terms conveyed, yet the purchasers of the mill lot and the mills on the sale under the execution, by virtue of the sheriff's deed, acquired the same right to overflow those lands for the use of the mills as they would have acquired by a conveyance from Newell, in the same terms, previous to the conveyance to Ward. And if Newell, who was the owner of both lots on the 20th of January, 1818, had conveyed the mill lot, with the mills thereon, to the proprietors of the triangle on that day, can there be any doubt that they would have had the right to continue to overflow the land subsequently conveyed to Ward, to the same extent that it was then overflowed for the use of these mills? The complainant has therefore a legal as well as an equitable claim to protection in the enjoyment of the right, to that extent. Although this might have constituted a good defence at law, yet, as the defendants have put in their answer and gone to proofs in the cause without any objection to the jurisdiction of the court, it is now correct and proper that I should declare and establish that right, and thus save to both parties the expense and trouble of reinvestigating the same question in a court of law. The defendants, and all persons claiming under them, must therefore be perpetually enjoined from commencing or prosecuting any suit or suits against the complainant or his heirs or assigns, for any damages which may have accrued or been sustained, or which may hereafter accrue or be sustained in consequence of the exercise of the right to raise the waters of the mill pond, for the use of the present mills or any others which may be erected in their place, to the extent to which such waters might have been raised by the dam which was in existence in January, 1818. And the decree must declare

1833.

Le Roy
v.
Platt.

and establish the right of the complainant to raise the waters of the pond to that extent for the use of the mills.

There has been much testimony introduced in this cause, for the purpose of ascertaining whether the present dam does in fact raise the waters of the pond to a still greater extent; and so as materially to affect the rights of the defendants in the enjoyment of their property. If it does not, the complainant is entitled to protection against any further litigation at law on that question. And if he is in fact infringing upon the rights of the defendants, they have an equal claim to a decree of this court, declaring and establishing their rights in reference to the present dam. The decretal order, which is now to be entered, must therefore further direct that if either party shall, within sixty days after the entry of such decree, elect to have a feigned issue awarded under the direction of this court to try this question, and to assess the damages of the defendants if the issue shall be determined in their favor, and shall file a notice of such election with the register, such an issue is to be made up and tried in the county of Genesee. And either party may have a struck jury for the trial of such issue, by giving notice to the adverse party of his or their wish to have such a jury, previous to the settling of the issue. If either party elects to have a feigned issue, then the question of costs in this cause, and all other questions and directions, except as above specified, are to be reserved until after the trial of the issue. But if neither party shall file a notice of such election within the time prescribed, then so much of the bill as seeks to restrain the defendants from prosecuting a suit or suits at law for any damages sustained by them, from raising the water above the prescribed limits, so as materially to affect the rights of the defendants, must be dismissed; and without prejudice to the rights of either party as to that part of the controversy between them. If a feigned issue is not awarded, neither party is to have costs, as against the other, in this suit.