## DUNKLEE *v.* THE WILTON RAILROAD COMPANY.

Deeds are to be construed with reference to the actual rightful state of the property at the time of their execution.

Property conveyed, passes, with all the incidents rightfully belonging to it, at the time of the conveyance.

Property reserved in a conveyance retains all its existing incidents.

Property conveyed, passes, subject to all existing easements which are apparent, and which result naturally from the relative situation of the land, and from the nature, construction and intended use of buildings, mills, &c., as they are then usually enjoyed.

In the case of easements connected with running water, "if the owner of two estates, between which there exist the apparent marks of an easement, dispose of one of the estates without his conveyance containing any stipulation or reservation relative to the easement, it continues to exist, actively or passively, in favor of the estate sold, or upon that estate."

If land is conveyed, described as bounding on an artificial water-course, such water-course will be regarded, as between those parties, as a natural stream.

Nothing which constitutes part of an estate, or which, as between the parties, is to be regarded as an incident to which the estate is subject, can be considered as an incumbrance.

CASE. The first count alleged that the plaintiff was the owner of a saw-mill and appurtenances, on a certain rivulet or stream in Merrimack, and had a right to the free course of the water in said stream, to and from said mill, without obstruction; that the defendants, on the 2d of October, 1848, by placing earth, stones and an embankment across said stream, so obstructed and im-

peded the course of the water in said stream from said mill, as to raise it above its natural height and produce back water, and have continued said obstructions, and thus, in a great measure, deprived the plaintiff of the profits of said mill.

The second count alleges that the plaintiff was entitled to the benefit of a certain race-way or water-course, in which the water was accustomed to flow from his mill, and the defendants, on the 2d of October, 1848, placed earth, stones and an embankment across said race-way or water-course, and by digging trenches and ditches near said embankment, so changed the course of said race-way or water-course, that the water did not flow in so straight a channel as before, and thus the water in said race-way was raised, and backwater caused, and the plaintiff deprived of the profits of his mill.

Plea, the general issue. The parties agree upon the following facts:

The plaintiff owned land in Merrimack, upon a small stream called Bridge Meadow Brook. J. & J. Parker owned land upon the brook below. In the fall of 1832, the plaintiff and J. Parker agreed to build a saw-mill on the line of their land, and the plaintiff, by the consent of J. & J. Parker, caused a channel or race-way to be dug from the proposed site of the mill, on the west side of the brook, which there makes a considerable curve to the east, in a direct course till it came to the brook again, some fifty rods below. In the spring of 1833 they erected the mill, and turned the brook from its original channel to the mill, and thence through this new race-way or water-course, in which the whole water of the brook continued to run till the obstruction complained of. The old channel of the brook had then grown up with bushes and grass, and become much filled up, and in many places difficult to trace, so that the water which drained into it from the surrounding land was slowly discharged.

In November, 1833, and October, 1835, J. & J. Parker conveyed to the plaintiff, with warranty, the lands they owned at and below the mill, so that the plaintiff became the sole owner of the mills, and of the land through which both the old channel of

the brook and the new race-way passed, from the point where they separate to where they again unite. On the 9th of May, 1848, the plaintiff conveyed to B. Kidder, by deed of warranty in usual form, with covenants against incumbrances, a part of the land purchased of Parker, through which the lower part of the old and new channels passed till they became united. The land is described as " beginning at a stone set in the ground, on the east bank of the brook running from Dunklee's saw-mill;" thence, by several courses, " to a stone set in the ground on the west bank of the brook above mentioned; thence northerly, by said brook," to a stone; thence, by other courses, " to a stone on the west bank of the Bridge Meadow Brook; thence northerly, by said brook, about thirty rods, to a stone in the west bank of said brook; thence westerly, about four rods, to a stone in the east bank of the saw-mill brook; thence, by said brook, southerly, about twenty rods, to the first bound mentioned."

The first and two last monuments are upon the new channel or race-way; the second and third upon the old channel, below the junction of the new; the others are upon the old and grown up channel of the brook.

June 26, 1848, B. Kidder conveyed to the Wilton Railroad Company a strip four rods wide, through the premises last described, upon which they built their railroad in October, 1848. It is an embankment of earth, crossing both the old and new channels, and entirely obstructing them both. A culvert was constructed about three rods west of the original channel, to which the owners of the meadows have made a straight ditch above and below, and through which the water flows more readily than before, and the change at this point has done no injury to the plaintiff's mill.

A culvert is made about one rod west of the original race-way or water-course from the mill, and the water-course is turned by a curve to pass to and from it. It is this change which causes the obstruction to the water for which the action is brought.

If the court should be of opinion that the plaintiff has a legal

cause of action, the damages are to be assessed by a jury; otherwise, the plaintiff is to become nonsuit.

*Atherton*, for the plaintiff.

1. The proprietor of land through which a stream runs, may divert it into any portion of his land, if the water is returned into the former channel before it passes into the land of another. *Norton* v. *Valentine*, 14 Verm. 239; *Weston* v. *Alden*, 8 Mass. 136; *Webster* v. *Fleming*, 2 Hump. 518.

2. Where a party owning land digs a race-way on it for a mill, and afterward conveys part of the land through which the race-way runs: as to his grantees, the race-way is to be considered the natural channel of the stream. *New Ipswich Factory* v. *Batchelder*, 3 N. H. Rep. 190.

A deed of land over which a water-course passes, conveys the right of the grantor as it then actually exists. *Cary* v. *Daniels*, 8 Met. 481; *Woodbury* v. *Short*, 17 Verm. 387.

3. The deed to Kidder describes the artificial channel as "the brook running from Dunklee's saw-mill," and conveys the land by that description.

*Gove*, for the defendants.

1. We admit the plaintiff's first position, that the owner may divert the water, returning it to its ancient channel, as laid down in *Norton* v. *Valentine*. The plaintiff and the two Parkers had the right to divert the water as they did, and the plaintiff, after his purchase from them, had the same right to divert the stream at his pleasure.

The case of *Weston* v. *Alden* goes merely to the point that the owner diverting a stream upon his own land, is not liable to an action by reason of the increased absorption.

*Webster* v. *Fleming* is to the point, that the owner below has no right to obstruct the mill of the owner above, though placed upon an artificial channel.

These authorities have no bearing upon the questions arising

in this case, except so far as they establish our right to divert the water, and are authority for us.

2. The case of *N. I. Factory* v. *Batchelder* is no authority for the plaintiff. There the artificial channel had been dug thirty-six years before, and was necessary to the mill. The point decided was, that by the sale of a mill, the right to use a race-way in other lands of the grantor, which had been long used with the mill and was necessary for it, passed as an incident to the mill, though not described nor included in any general terms in the deed. If in this case the plaintiff, instead of selling the land below his mill, had sold the mill itself, a case of necessity might arise, and the grantee might hold the race-way as an appurtenance to the mill.

*Woodbury* v. *Short* was a case between adjoining owners upon a stream, where it was held that the owner of the land above, after having for ten years assented to the water's flowing in a new channel, cut by an unusual flood, could not divert the stream into the old channel to the injury of the land below. Here there was no adjoining owner whose rights were to be affected by long acquiescence in the new course of the stream. Except for a few months, the land was all his own. There can be no prescription against himself on his own land.

The right to a water-course is compared to a right of way. *Smith* v. *Higbee*, 12 Verm. 113. A right of way is extinguished by unity of possession, unless it be a way of necessity. *Whalley* v. *Tompson*, 1 B. & P. 375; *Hawton* v. *Frearson*, 8 D. & E. 50; *Burley* v. *Coles*, 5 Taunt. 311.

The convenience of a way to the owner does not operate to prevent its extinction by unity of possession.

If the owner of a mill and privilege sells the mill, the right of flowage passes; but if he sells the land subject to be flowed, without a reservation, it can no longer be flowed. *Preble* v. *Reed*, 5 Shepley 169. There is no implied reservation in such a case.

The plaintiff deeded the land to Kidder, with a warranty against incumbrances; he cannot be permitted to say against

his own warranty that he retains an incumbrance, or any right in the land. When a party sells land, he sells it with all the rights he has in it. He had the right to shut up this channel, and he sold to us the same right to shut it up. Instead of his suing us, we could sue him for turning the water down this race-way. Although we have been at the expense of making a culvert, we had the right to stop the channel entirely if we pleased.

*Atherton*, in reply. The case in Shepley has no application. That was a case of land flowed by a mill, which is substantially different from the case of a mere change of the channel. The flowing is an incumbrance, but the party who makes a change in a water-course could hardly be charged for an incumbrance. Here, at the time of the plaintiff's conveyance to Kidder, the original channel was nearly obliterated. The railroad have entirely obstructed the original channel. If that is the rightful course of the stream, then they are liable for obstructing that. It can make no difference whether the new channel has been cut one year or twenty years, since there can be no prescription in favor of the owner in his own land.

We rely on the ground that as to the plaintiff and his grantees, this race-way is to be taken as the natural channel—a doctrine supported by the cases of *Cary* v. *Daniels*, *Factory* v. *Batchelder*, and *Woodbury* v. *Short*.

It is suggested that the defendants have the right to maintain an action against us for suffering the water to run in this ditch. So extraordinary a consequence shows the absurdity of the ground taken.

A. builds a mill, and cuts a channel for the water in his own land, and the old channel is filled up; he deeds part of his own land, including the new channel, and describing it as *the brook*. Recognizing that as *the brook*, have the railroad a right entirely to obstruct the brook? There is no other brook from the mill but this, and this runs rightfully there.

BELL, J. We take it to be clear that at common law, as between the grantor and grantee, and those claiming under them, every deed conveys the property described in its existing state ; that is, as it usually and rightfully is at the time of the execution of the conveyance. Such deed is to be construed in all its parts with reference to the actual, rightful state of the property conveyed at the time of the conveyance, unless some other time is expressly referred to. This position does not require the citation of any authority. No man supposes that when he buys land he has any claim growing out of the fact that the timber, which once formed a part of it, has been cut off, the house burned, or the mill washed away. He takes the land as it is, and, if there is no fraud, has no claim because of any apparent deterioration the property may have previously undergone. Most of the cases which we shall have occasion to cite will be found to have a direct bearing in support of this general position.

Property conveyed, passes, with all the incidents then rightfully belonging to it, or actually and usually enjoyed with it at the time of the conveyance, so far as they are necessary to the full benefit and perfect enjoyment of the property, without any specification of them, and without the usual phrase, " with all the privileges and appurtenances to the same belonging." " *Lex est, cuicunque aliquis quid concedit, concedere videtur et id, sine quo res esse non potuit.*" *Lyford's Case,* 11 Co. 52. This position is supported by a great number of cases, never contradicted or questioned. It will be sufficient for our present purpose to cite some cases which relate to mills and streams, the immediate subject of inquiry in this case. They support the principle that a conveyance of a mill, or of land on which a mill is situate, carries with it, as incidents of the mill, the right to raise the mill-pond, and to flow the lands above as high as the dam has been usually kept up, and to maintain the dam and floom which are necessary to support the water at that height, and to support and use the pentstocks, aqueducts and channels which are necessary to convey the water to the mill, and the channels and race-ways which are necessary to conduct the water from the mill to the

stream below, in the manner in which they have been kept and used immediately previous to the conveyance, so far at least as the grantor has a right to convey such privileges. Shep. Touch. 89; *Nicholas* v. *Chamberlain*, Cro. Jac. 171; *Vickary* v. *Buswill*, 1 Shep. 289; *Preble* v. *Reed*, 5 Shep. 169; *Hathorn* v. *Stinson*, 1 Fairf. 224; *Wetmore* v. *White*, 2 Caine. Ca. 87; *Leroy* v. *Platt*, 4 Paige 77; *Burr* v. *Mills*, 21 Wend. 290; *New Ipswich Factory* v. *Batchelder*, 3 N. H. Rep. 190; *Whitney* v. *Olney*, 3 Mason 280; *Gibson* v. *Brockway*, 8 N. H. Rep. 465; *Pettee* v. *Hawes*, 13 Pick. 323; *Blake* v. *Clarke*, 6 Greenl. Rep. 436; *Oakley* v. *Stanley*, 5 Wend. 523; *Kilgour* v. *Ashcomb*, 5 H. & J. 82; *Canham* v. *Fisk*, 2 Cromp. & Jer. 126; 2 Tyr. 185; *Elliott* v. *Shepherd*, 12 Shep. 371.

The same rule applies in the case of the reservation of a mill or mill privilege in a conveyance of land. *Pettee* v. *Hawes*, 13 Pick. 323; *Jackson* v. *Vermilyea*, 6 Cow. 677; *Allen* v. *Scott*, 21 Pick. 25; *French* v. *Carhart*, 1 Comst. 103; Shep. Touch. 100; 1 Saund. 326, n. 6; *Doud* v. *Kingcote*, 6 M. & W. 197; *Hinchcliffe* v. *Kinnout*, 5 Bing. N. C. 1.

These cases are usually supported by the doctrine of implied grant, and may well stand upon that ground. They all support the position we have stated, that as to the incidents of real estate, deeds are to be construed with reference to the state of the property at the date of their execution; and this as well as to what is impliedly granted as to that which is expressed.

Our next position is, that property conveyed passes in its existing state, subject to all existing easements and burdens of a similar nature, in favor of other lands of the grantor, which are apparent, and which result naturally from the relative situation of the land, and from the nature, construction and intended use of the buildings, mills, &c., upon it, and their situation and connection with other property as they were usually enjoyed at the time of the conveyance. We propose to advert to the authorities upon this point more at length, because, although there is a series of decisions for several centuries back, all, as we regard them, tending to support the above position, few if any of them are

Dunklee *v.* The Wilton Railroad Company.

distinctly placed upon this broad ground, while many of them rest upon the once fashionable refinements of unity of possession, revivor and extinguishment.

And first, the cases heretofore cited are regarded as affording a clear support to this position upon the view we take of the nature of easements connected with the flow of water. Every easement of this class necessarily implies a duty upon the owner of the servient tenement, and every such duty implies a corresponding right in that owner. Thus the owner of land upon a stream has an easement upon the land above, that the water of the stream shall flow down upon his land at a certain place, at a certain level, and in a certain quantity. This right imposes upon the owner of the land above, the duty and obligation of suffering the water to flow agreeably to this privilege of the owner below; and it confers upon the same owner the right to discharge the water in that place and in that way, and imposes upon the owner of the land below the duty and obligation to receive the water in that place and in that manner. These rights and duties are reciprocal, and necessarily coëxistent. The creation of one necessarily creates all the others. If one estate has an easement upon that above, to discharge the water in a particular manner, the estate above has a reciprocal easement upon that below, to receive the water in that particular manner. Each estate is in turn the dominant tenement, as to the easement from which it derives a benefit, and the servient tenement, as to the corresponding easement of which the other estate has the advantage. Thus if a man has a dam extending across a stream, with a mill on each side of it, and he sells to another person one mill, with the land on which it stands, without specifying or reserving any incidental rights, the purchaser of the mill has, agreeably to the cases before cited, the right to keep the water raised to its usual height. The grantor is bound to permit the water to flow at the height which is necessary to operate the mill. He cannot build a dam to prevent such flow of the water. He cannot remove his part of the dam and thus prevent it; but, as a necessary consequence, he has the reciprocal easement upon the land he

has conveyed—the right to require the purchaser to receive the water at the level he is bound to discharge it, and to do no act by which this right may be impaired; which is, in effect, that the purchaser shall maintain the water on his part at the same level his grantor is bound to keep it, of which the mill he has retained will of course have the benefit; and if the purchaser opens his gates, or removes his dam, and thus permits the water to flow at a less height, he is answerable to his grantor for diverting the water. The case last supposed is, as to this point, the precise case of *Runnels* v. *Bullen,* 2 N. H. Rep. 532. The result of this view is, that in every case where there is an implied grant of an easement in favor of the grantee of a mill or water privilege, the same grantee takes the mill or privilege, subject to the corresponding easement in favor of the grantor. If the one cannot divert the water from the mill he has granted, the other cannot obstruct its flowing to the mill in the usual and rightful manner at the date of the conveyance. This is a result that cannot be explained upon any doctrine of implied grant, and if implication is to be resorted to, it is the case of implied reservation. All the cases cited then, in our view, go to establish the position that wherever an easement is granted, either expressly or by implication, connected with the flow of water, there is an implied reservation of the corresponding and reciprocal easement upon the estate conveyed. From which it follows that the idea advanced in some books, that there can be no implied reservation, (see *Burr* v. *Mills,* 21 Wend. 290,) is entirely without foundation; that the reverse is true, and a reservation of easements is necessarily implied in every case where easements of this class are either expressly or impliedly granted. This, it will be seen, upon consideration, is but another form of setting forth the position we are now discussing, that property conveyed passes in its existing state, subject to all existing easements and burdens of a similar nature, in favor of other lands of the grantor which are apparent, and which result naturally from the relative situation of the land, and from the nature, construction and intended use of the buildings, mills, &c., upon it, and their situation and con-

nection with other property as they were usually enjoyed at the time of the conveyance.

The following cases are regarded by us as directly supporting this doctrine :

11 H. VII. 25, (1496,) 1 Bro. Ab. 324. A man having two tenements, adjoining to one of which there is a gutter leading through the land of the other, sells one tenement to one person, and the other to another, it was held the easement of the gutter continued. It would have been otherwise, if before the conveyance, the owner had broken the gutter.

*Nicholas* v. *Chamberlain*, Cro. Jac. 121, (1607.) It was held by all the court, upon demurrer, that if one erect a house, and build a conduit thereto in another part of his land, and convey water by pipes to his house, and afterward sells the house with the appurtenances, excepting the land, or sells the land, reserving to himself the house, the conduit and pipes pass to the house.

This case is quoted as sound law by *Lewis*, J., in *Jackson* v. *Striker*, 1 Johns. Ca. 291, and by *Cowen*, J., in *Burr* v. *Mills*, 21 Wend. 296, though the two cases, as to this point, are in direct conflict.

*Sury* v. *Pigott*, Palm. Rep. 444, (1626); *S. C.*, Latch, Rep. 153 ; Poph. 166 ; 3 Buls. 339 ; Noy 84 ; W. Jones 145. One owned a rectory, to which there was a watering place, supplied by a stream which flowed from a brook through his hop-yard. He sold the rectory to one, and the hop-yard to another. Afterward, the owner of the hop-yard obstructed the stream, and the court held the easement of the stream remained.

*Doddridge*, J., put this case : One having a mill, had a water-course to it over his own land, and sold part of the land where the water-course run ; and then he says : For the necessity, (we should say, from the nature of the case,) the water-course remains to the vendor, and the vendee cannot stop it.

*Hazard* v. *Robinson*, 3 Mason 272. One had two mills. He sold the lower mill, with all the privileges and without reservation, and afterward sold the upper mill. The owner of the

lower mill raised his dam, and thereby obstructed the upper one. It was held the grant of the lower mill conveyed it, with such privileges as to the dam and water as were at that time used and appropriated to it.

The case of *Sury* v. *Pigott* and *Nicholas* v. *Chamberlain* were cited by *Story*, J., at much length, and approved.

*Kent*, (3 Cowen 449,) says: "Nor is a water-course extinguished by unity of possession;" and this from the necessity of the case and the nature of the subject. This was settled after a very elaborate discussion, in *Sury* v. *Pigott;* and that case was accurately examined and deliberately confirmed in all its parts in *Hazard* v. *Robinson*.

*Cary* v. *Daniels*, 8 Met. Rep. 466. The owners of two mills on the same stream, conveyed the upper mill and privilege, and land, warranted free of incumbrance. They afterward conveyed the lower mills. The lower mill, at times, threw back water upon the upper. *Held*, that the purchaser took the upper mills and privilege as they existed, and were modified and appropriated by the lower dam when it was conveyed.

*Whitney* v. *Eames*, 11 Met. Rep. 517. The doctrine of *Cary* v. *Daniels* was again considered and approved; and it was held that the purchaser of an upper mill privilege would purchase subject to the actual appropriation [of the water to the use of the vendor's mill below,] and if there were no reservation in terms by the vendor, he would retain the privilege [below] as actually appropriated and used.

*Tucker* v. *Jewett*, 11 Conn. 311. It was held that several tenants in common of mills and land, making partition by releases in which there was no reservation, the owner of the mill had the right to flow the water upon the land he had released, to the height it had been used to flow, and that the mill-owner, having afterward conveyed the land above his mill without any reservation, could not be disturbed in flowing the water to its usual height.

*Seibert* v. *Levan*, 8 Barr. 383, [9 U. S. Dig. 133.] Where a tenant in fee erects a mill, with a dam and race to supply the

same, and afterward conveys that part of his land whereon are the dam and race, without any express reservation as to them in his deed, his grantee takes the land, burdened with an easement in favor of the grantor, which the grantee is not at liberty to disturb.

The cases of *Randall* v. *Silverthorn*, 4 Barr. 173, [7 U. S. Dig. 159,] and *Fry* v. *Whitman*, 7 Barr. 440, [8 U. S. Dig. 368,] in effect support the position we are discussing, though we might not assent to some views stated in the Digest as presented by the court.

*Perry* v. *Parker*, 1 W. & M. 280. When the same owner of land with a mill privilege conveys them to different persons, it will be presumed that each is to preserve the privileges used with it before the junction of the estates, unless some change distinctly appears.

*French* v. *Carhart*, 1 Comst. ·96. A. conveyed to B. land upon a stream which was flowed by his mill below, " *saving all creeks and streams of water.*" It was held, better to give effect to the spirit of the instrument and the intention of the parties, that the grantor reserved the use of the water as he was then using it, and that the court were bound to presume such to have been the intention, unless restrained by express words.

This case seems substantially to overrule *Burr* v. *Mills*, though not in terms. In that case there was no reservation.

*Kilgour* v. *Ashcombe*, 5 H. & J. 82, [cit. Ang. W. C. 169.] In a division of real estate among heirs in Maryland, where a mill was assigned to one, and part of the dam is on land assigned to the other, it was held the assignee of the mill has a right to use the mill and dam in the same way, and to the same extent, as they had been used by the deceased in his lifetime.

*Busdick* v. *Glasko*, 18 Conn. 494, [8 U. S. Dig. 366.] A. and B. were owners of mills on the same dam. B. raised the dam on his side so as to throw the water upon A.'s wheel. It appeared that both parties claimed under the same title, and there was no special reservation as to this matter. *Held*, A. could maintain his action. Ang. W. C. 414.

It would seem the principle involved here was the same as in *Runnels* v. *Bullen*—that the parties were entitled to the water, *uti currere solebat.*

*New Ipswich Factory* v. *Batchelder*, 3 N. H. Rep. 190. The owner of a mill and race-way sold the mill to one person, and afterward the land in which the race-way was, passed to another. *Richardson*, C. J., says: "As both these parties claim under the same person, it seems to us that, as between them, this race-way is to be considered as the natural channel of the river."

*Runnels* v. *Bullen*, 2 N. H. Rep. 532. One owning a dam across a river, with mills on each side, conveyed to the defendant's grantor the north half of the dam, and the mills on that side, with the privilege of taking the water from any part of the north half of the dam for the use of the grantee, &c., without any reservation. He afterward conveyed the south half of the dam, and the mills on that side, to the plaintiff. The defendant having another mill below, kept the gates of his half of the dam permanently raised, by reason of which the plaintiff lost the use of his mill. It was held that the defendant had no right to raise his gates, and lower the water of the mill-pond below the usual level, to the injury of the plaintiff. In effect, this decision was, that the defendant took his dam and mills subject to the easement, for the benefit of the plaintiff, of keeping up the water of the pond to its usual height.

The following cases seem to be in conflict with the preceding decisions, and, to some extent, with the principle we have cited them to sustain: *Preble* v. *Reed*, 5 Shep. 173 ; *Johnson* v. *Jordan*, 2 Met. 234 ; *Manning* v. *Smith*, 6 Conn. 289 ; *Burr* v. *Mills*, 21 Wend. 290 ; and see *Leroy* v. *Platt*, 4 Paige 77. We regard the cases in Massachusetts, Connecticut and New-York, as substantially overruled, as to this point, by the later decisions in the same States, to which we have referred. They are decided upon other grounds, not directly involving the principle we have maintained. And upon all the cases we have found, bearing upon the question and relating to water rights, we think the

weight of authority greatly preponderates in favor of the view we have taken.

The following cases, relating to other easements, go strongly to sustain the same view:

*Robins* v. *Barnes*, Hob. 131; Moor 866; Rolle's Ab. 936; Ext. Mar. Dic. 7. Where a party had wrongfully obstructed a window in a house, which he afterward purchased and sold to another, it was held that the purchaser could not abate the nuisance, " being that he (the purchaser) ought to take it (the house) in such plight as it was at the time of the grant made to him." " The court agreed that though one of the houses had been built overhanging the other wrongfully before they came into one hand, yet after, when both came into the same hands, the wrong was purged, so that if the houses came afterward into several hands, yet neither could complain."

But note, (says the reporter,) that there is a great difference between interests and profits, as rents, commons, &c., and bare easements, such as are lights, air, gutters, stillicidia and the like; for though, while they (the tenements) are in one hand, they (the lights, &c.,) may be stopped or foredone, because a man cannot be said to wrong himself; yet, if they (the tenements) be divided, things of that nature [still in being] do revive, because they are of no less use of themselves in one hand than in divers, being equally, [*rebus stantibus*, in the same use and occupation,] necessary for the several houses to which they belong. But clearly, if even such things be foredone or altered while they are in one hand, and so being, the houses be again divided, they cannot be restored by law, but must be taken as they were at the time of the conveyance.

*Palmer* v. *Fletcher*, 1 Lev. 122; 1 Sid. 167; 1 Keb. 153, 625, 794. The opinion of *Tevisden*, J., was, that if a man erect a house on his own land, and afterward sell the house to one, and the land to another, whether the house be sold first or afterward, the vendee of the land cannot stop the lights of the house; and cited a case to be so adjudged. *Kelynge*, J., *contra*.

*Reviere* v. *Bower*, 1 Ry. & Mo. 24. The plaintiff was owner

of a house which he divided into two tenements. One of which he leased to the defendant, and he occupied the other himself. The defendant obstructed a window which the plaintiff made in his own tenement shortly before the lease to the defendant. *Held*, that the action was maintainable against the tenant for obstructing a window in the landlord's house, which was there at the date of the lease, though lately made, and though there was no stipulation in the lease against the obstruction.

*Compton* v. *Richards*, 1 Price 27. *Held*, that if the owner of two houses, one of which is unfinished, but the places of the windows are apparent, sell the same to different persons at the same time, the purchaser of the finished house cannot place an obstruction in the way of the proposed windows of the other house—the sale being upon an implied condition that those windows should not be obstructed.

The cases of ways of necessity are within the same principle. They are burdens of the nature of easements, which are apparent, and which naturally result from the relative situation of the property. 2 Bro. Ab. 104, Nuisance 11; 2 Rolle's Ab. 60, Grant, Z, 17, 18; *Jordan* v. *Atwood*, Ow. Rep. 121; 2 Lutw. 111; *Parker* v. *Welsteid*, 2 Sid. 39, 111; *Dutton* v. *Taylor*, 2 Lutw. 1487; *Bulkley* v. *Coles*, 5 Taun. 311; *Howton* v. *Frearson*, 8 D. & E. 50; *Clark* v. *Rugge*, Cro. Jac. 170; *Oldfield's Case*, Noy 123; 1 Wm. Saund. 323.

Ways of necessity are usually spoken of as exceptions to the general rule that easements are extinguished by unity of possession. 3 Kent's Com. 449; *Hazard* v. *Robinson*, 3 Mason 276. But it seems more correct to regard them as new rights, impliedly granted or reserved by the conveyance. *Grant* v. *Chase*, 17 Mass. 447.

The principle that such ways of necessity are not extinguished by unity of possession, affords a clear solution of this class of cases, as far as it applies; but it is by no means broad enough to reach all the cases. It is immaterial whether there has ever been an easement of the kind before. The way is implied, not because an easement has previously existed, but because without

Dunklee *v.* The Wilton Railroad Company.

it the grantee cannot have the enjoyment of the thing granted; or the grantor would be deprived of the enjoyment of the property which he retained.

The doctrine of implied grant of whatever is necessary to the enjoyment of the principal thing granted, would apply to one large class of these cases; but it has no application to the cases where a way of necessity is reserved for the benefit of the grantor, by the law, without any stipulation of the parties, across the property granted to the land which he has retained. To these a doctrine of implied reservation is as indispensable as that of implied grant is to the others; and we think all the cases to which we have referred sustain our general position, that easements are in all cases impliedly conveyed or reserved in favor of other lands of the grantor, without any special words, whenever the burden is apparent, and naturally results from the relative situation of the property, if land alone, or from the nature, construction and intended use of buildings and mills, and their situation and connection with other property.

Agreeably to these views, we hold that the right to use and enjoy the race-way from the mill to the stream below, was impliedly reserved to the plaintiff in his deed to Kidder; or, in other words, that the land passed to Kidder, subject to such use and enjoyment by the plaintiff; and the defendants are consequently liable for interfering with that right.

The doctrine of the extinguishment of easements by unity of possession, and that of the revivor of easements, of necessity, upon the division of the estates from and to which the easement is due, can have no application in this case, because there was no easement in existence at the time when the plaintiff purchased the interest of the Parkers in the mills, and in the meadow below.

It is clear upon the decisions, which it is not necessary here to question, whatever doubt there might otherwise be upon the points, that an easement is an incorporeal hereditament, which lies in grant at common law, (2 Bla. Com. 317; Co. Litt. 172;) and that it is such an interest in lands as cannot pass without

writing, by the statute of frauds. *Hewlins* v. *Shippam*, 5 B. & C. 221; *Fentiman* v. *Smith*, 4 East 107.

The change of the channel, therefore, by the verbal agreement of the parties, gave to the plaintiff no rights, but merely at the pleasure of the parties. The consent of the Parkers was of the nature of a mere license, which was revocable at any moment. The interest of the plaintiff in the race-way was of the nature of an estate at will, at most, liable to be terminated at any time. It of course ceased upon the purchase of the property by the plaintiff, because the owner of property cannot be tenant at will to himself, nor act by any license in regard to it but his own pleasure; but it was not extinguished as an easement, because no such interest had ever existed.

Independently of the technical notion of the common law, which requires all grants of incorporeal hereditaments to be in writing, and of the statute of frauds, which requires all creations and assignments of any interests in land to be in writing, we suppose there can be no doubt that, by a common agreement of all parties interested, though merely verbal, any change may be made in the actual state of property, and easements created as necessary consequences of that change; as, for example, a new channel may be made for a stream, the water turned into it, and the old water-course abandoned or obliterated, and the new channel would thenceforth be the only channel; and as to all the parties, and those who claim under them, it must be regarded as the natural channel, with all the easements and incidental rights which would belong to it if there never had been any other.

As, then, the owner of land having the only interest in the matter, can make no grant to himself, and can execute no instrument in writing by which a change in the property can be made while he remains owner, and as he has the right, by virtue of his ownership, to make any disposition of the property which he pleases, it seems to follow that if he does make any change in the property, those who claim under him, and derive their titles from him, must take the property in the state it is in at the time,

precisely as if it had been its natural state, and no other had ever existed.

In accordance with this view is the principle borrowed by Gale & Whatley, in their treatise on easements, from the French law : "That the disposition of the property made by the owner of two estates constitutes a valid title to the easements created by him, which are apparent when the estates are again separated and pass into different hands. Gale & What. Easements 38, &c.

Art. 694 of the Code Civil, states the rule of the French law thus : " If the proprietor of two estates, between which there exist the apparent marks of a servitude, dispose of one of the estates, without his conveyance containing any stipulation or reservation relative to the servitude, it continues to exist, actively or passively, in favor of the estate sold, or upon that estate." All the authorities to which we have referred support this doctrine as the true rule of our law, though they do not, so far as we recollect, in any instance allude to the principle in terms.

The same decision, which we feel compelled to make as to this case, on general principles, must also be made upon the peculiar circumstances of the case itself. Nothing is clearer than that in giving construction and effect to a contract or conveyance, we are to take into consideration the situation of the parties and of the property, and all the provisions and expressions of the instrument. The object is to ascertain the true meaning and real intention of the parties. Here, then, the plaintiff was the owner of a valuable mill, with a race-way to conduct the water from the mill in the most direct way to the stream below. This race-way was constructed by the consent of all parties interested, at much expense, because it was regarded as necessary for the operation of the mill in the most advantageous way. It had been in use for several years, and until the original channel had become to a great extent obstructed, and could not readily be restored. Under these circumstances, the plaintiff conveyed a portion of his land, in which this race-way is situate, to Kidder, and in describing the land conveyed, says—" bounding on the saw-mill

brook," which it is admitted is this artificial race-way, and " on the Bridge Meadow Brook," which was the original channel; and the deed contains no reservation or stipulation looking to any change proposed or feared of these water-courses. Now we think the mention of this race-way as *the saw-mill brook,* is a recognition of it as being, as between these parties, *the brook*—the natural channel—since that is the natural force and signification of the word *brook,* and is entirely equivalent to an agreement that, as between these parties, this race-way is to be regarded as the natural stream.

It might well be contended that there was an implied covenant from the language of this description, that the mill brook did in fact run at the places described, so that the purchaser would have the benefit of it there. Thus it has been held that where land is conveyed as bounded upon a way, there is an implied covenant that there is such way. *Parker* v. *Smith,* 17 Mass. 413; *Livingston* v. *Mayor, &c., of New-York,* 8 Wend. 85; *Emerson* v. *Wiley,* 10 Pick. 310.

It is very apparent that the right of the defendants to require that the mill brook should remain in its present channel, may be as important and valuable to them as it is to the plaintiff that it should remain unobstructed. A change might compel them to substitute for the small culvert at the original channel, a wider bridge, sufficient to carry the entire flow of the stream. Such a change they would be likely to resist, and upon the ground that the plaintiff has, by his description, made the race-way, as between them, the natural channel of the stream. If that is a correct position, as we think it, the same conclusion must follow when the rights and duties of the plaintiff are in question.

Either of the views suggested furnishes an answer to the argument drawn from the covenant against incumbrances. Nothing which constitutes a part of the estate, or which, as between the parties, is to be regarded as an incident to which the estate is subject, can be deemed an incumbrance. *Pettee* v. *Hawes,* 13 Pick. 323. See *Cary* v. *Daniels,* before cited.

We are of the opinion, then, that upon the case stated, the

plaintiff is entitled to recover damages for the obstruction of the water, to be assessed by a jury.

In the conclusions to which we have arrived, as to the decision of the case before us, the court are agreed. Perhaps some of the views suggested should be considered rather as those of the judge who delivers the opinion—the examinations of his brethren not having led them over the same ground.